1  KAREN P. HEWITT
   United States Attorney
2  REBEKAH W. YOUNG
   Assistant U.S. Attorney
3  California State Bar No. 214859
   United States Attorney's Office
4  880 Front Street, Room 6293
   San Diego, California 92101-8893
5  Telephone: (619) 557-7179
   E-mail: rebekah.young@usdoj.gov
6
   Attorneys for Plaintiff
7  United States of America

8              **UNITED STATES DISTRICT COURT**

9            **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  UNITED STATES OF AMERICA        )  Criminal Case No. 07CR3404-JLS
                                    )
12              Plaintiff,          )
                                    )  **GOVERNMENT'S RESPONSE IN**
13                                  )  **OPPOSITION TO DEFENDANT'S**
            v.                      )  **MOTION FOR DISCOVERY**
14                                  )
                                    )  **TOGETHER WITH STATEMENT OF**
    JESSE BENAVIDES. Jr, and        )  **THE CASE AND MEMORANDUM OF**
15  JOSE FERNANDEZ-FERNANDEZ a.k.a. )  **POINTS AND AUTHORITIES**
    JOSE BECERRA-CASILLAS,          )
16                                  )
                Defendant.          )  Date:   January 23, 2008
17                                  )  Time:   1:00 p.m.
   _____    )  Court:  The Hon. Janis L. Sammartino
18

19          COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel, Karen

20  P. Hewitt, United States Attorney, and Rebekah W. Young, Assistant United States Attorney, and

21  hereby files its Response in Opposition to Defendant's Motion for Discovery and for Leave for File

22  Further Motions.  The Government's Response is based upon the files and records of the case together

23  with the attached Statement of the Case, Statement of Facts, and Memorandum of Points and

24  Authorities.

    //
25
    //
26
    //
27
    //
28
    //

# I

## STATEMENT OF THE CASE

On December 19, 2007, a federal grand jury in the Southern District of California returned a nine-count Indictment charging defendant Jesse Benavides Jr. ("Benavides") and defendant Jose Fernandez-Fernandez ("Fernandez") with Bringing in Aliens for Financial Gain, in violation of 8 U.S.C. §1324(a)(2)(B)(ii) and Aiding and Abetting, in violation of 8 U.S.C. §2, as well as Transportation of Illegal Aliens Causing Serious Bodily Injury and Aiding and Abetting, in violation of 8 U.S.C. §1324(a)(1)(A)(ii) and (v)(II) and (a)(1)(B)(iii). These charges comprised counts 1 through 8 of the Indictment. In count 9 of the Indictment, Fernandez was further charged with Deported Alien Found in the United States, in violation of 8 U.S.C. §1326(a) and (b). On December 20, 2007, Benavides and Fernandez were arraigned on the Indictment and entered a plea of not guilty.

# II

## STATEMENT OF FACTS

### A.    Apprehension of Defendant Fernandez

On December 7, 2007, at approximately 6:00 p.m., Border Patrol Agent J. Weiss was performing his assigned scope operator duties when he observed a group of approximately 13 illegal aliens on top of an area known as "Airport Mesa." (Airport Mesa is located two miles east of Jacumba, California and approximately 25 miles east of the Tecate Port of Entry. The southern part of Airport Mesa marks the United States/Mexico border and is routinely utilized by illegal alien foot guides because of its elevation. The foot guides are able to monitor the movements of Border Patrol agents from this vantage point and can thus cross their groups into the United States. Old Highway 80 is located just north of Airport Mesa and parallels the border for several miles to the east and to the west. Alien smugglers and narcotic smugglers like to use this area because it is close to the border and provides quick and easy access to Interstate 8 heading both east and west.) At approximately 6:10 p.m., Border Patrol Agent B. Beaton and Supervisory Border Patrol Agent J. Ortiz responded to the area in an attempt to observe the group of illegal aliens that Agent Weiss had spotted descending from the Airport Mesa. At about 6:15 p.m., Agent Weiss radio'd that the group was now walking northbound towards Old Highway 80 from

1  the west face of Airport Mesa.  Agent Ortiz responded from Interstate 8 and positioned himself on

2  Carrizo Gorge Road to wait for further information on the group's location.

3        At about 6:24 p.m., Agent Weiss relayed that the group was now loading into a vehicle and

4  departing from the area northbound on Carrizo Gorge Road.  Agent Weiss had visual contact with the

5  vehicle at all times.  Once other agents came into visual contact with the vehicle, Agent Weiss returned

6  his attention back to Old Highway 80.  Agent Weiss returned his scope to the area where he observed

7  the subjects enter the vehicle and observed four remaining individuals that had not loaded into the

8  vehicle. Agent Weiss advised agents on foot near the location that four individuals were still near the

9  Airport Mesa. (Agent Weiss noted that one of the four remaining individuals -- later identified as

10 defendant Fernandez -- had guided the first group into the vehicle, but did not actually get into the

11 vehicle himself. Instead, Fernandez returned south towards the three subjects who had been left behind.

12 Fernandez and the three remaining subjects were approximately 150 yards south of Old Highway 80

13 where the first group had loaded.

14        Agent Weiss was able to direct Border Patrol Agent M. Zakraysek to the location where the

15 remaining four subjects were attempting to conceal themselves in the brush. Fernandez began to run

16 away from the three subjects that were concealed as agents approached his location. Fernandez ran south

17 towards Mexico, which, at this point, was approximately 200 yards south of their location.  Agent Weiss

18 while still using an infrared thermal imaging scope, guided Agent Zakraysek to Fernandez's location.

19 Once he arrived, Agent Zakraysek identified himself as a Border Patrol agent and questioned Fernandez

20 as to his citizenship. Fernandez stated that he is a national and citizen of Mexico and did not have any

21 documents that would allow him to be in the United States legally. Agent Weiss was then able to guide

22 Agent Zakraysek north to the remaining three individuals. Agent Zakraysek was able to locate and

23 apprehend the three remaining subjects. Once again, Agent Zakraysek identified himself as a Border

24 Patrol agent and questioned the three subjects as to their citizenship. All three subjects stated that they

25 were citizens and nationals of Mexico who did not have any legal immigration documents that would

26 allow them to be or remain in the United States.  Fernandez and the three subjects were arrested and

27 transported to the Border Patrol Boulevard Station for processing.

28

1  **B.     <u>Apprehension of Defendant Benavides</u>**

2          In the meantime, Agent Ortiz drove southbound on Carrizo Gorge Road and after approximately

3  five seconds observed the only vehicle traveling northbound, a silver Tahoe Chevrolet SUV, drive past

4  his location on Carrizo Gorge at a high rate of speed. Agent Ortiz immediately performed a U-turn on

5  Carrizo Gorge road in an attempt to further observe the silver Tahoe's direction of travel. As Agent Ortiz

6  approached the Interstate 8 Jacumba interchange, he noticed that the silver Tahoe was now traveling

7  westbound on Interstate 8.  At approximately 6:26 p.m., Agent Ortiz relayed this information to all units

8  in the area and continued to observe the silver Tahoe from a distance. Agent Ortiz continued to follow

9  the silver Tahoe for approximately three miles and updated other agents that were responding to the

10  location.  Border Patrol agents from the Boulevard Stations informed Agent Ortiz that a Controlled Tire

11  Deflation Device (CTDD) was in place on westbound Interstate 8, just west of the McCain Valley

12  Bridge. At approximately 6:28 p.m., Agent Ortiz radio'd that he was going to attempt a vehicle stop on

13  the silver Tahoe. Agent Ortiz activated his lights and siren on his marked service vehicle and noticed

14  that the silver Tahoe was not yielding. Agent Ortiz immediately informed the agents who were

15  positioned at the McCain Valley Bridge that this was a failure to yield. Agent Ortiz remained in the #1

16  (passing) lane approximately one-quarter mile behind the silver Tahoe.

17          At approximately 6:30 p.m., Supervisory Border Patrol Agent M. Hansen deployed the CTDD

18  just west of the McCain Valley Bridge and successfully deflated the tires of the silver Tahoe. The driver

19  of the Tahoe continued to travel westbound at a high rate of speed on the Tahoe's deflating tires. The

20  force with which the tires drove over the CTDD caused the device to be catapulted some distance away

21  pulling Agent Hansen's hand with it. The force caused great tension in the rope, severing the top third

22  section of Agent Hansen's middle left finger. Agent Hansen realized that he needed medical attention

23  and another agent immediately drove him to Grossmont Hospital for medical attention. Agents in the

24  area and others responded to the area where Agent Hansen had deployed the CTDD and approximately

25  one hour later they located the severed piece of Agent Hansen's finger. They immediately drove the

26  piece of the finger to the hospital but doctors stated that they would be unable to reattach the piece.

27

28

1    Immediately after the CTDD was deployed, Agent Aoude was located west of the CTDD and

2    observed the silver Tahoe approaching his location. Agent Aoude observed the driver -- later identified

3    as defendant Benavides – driving in an erratic fashion and having a hard time maintaining control of the

4    Tahoe as he continued to drive the silver Tahoe on westbound Interstate 8 for approximately 2.9 miles.

5    The driver then made an abrupt left hand turn through a median approximately one mile west of the

6    Ribbonwood Exit on Interstate 8. At this location, the driver drove the disabled silver Tahoe through

7    the median of Interstate 8.  The driver drove across the dirt median on the silver Tahoe's rims into

8    oncoming traffic in the eastbound lanes of Interstate 8 with little regard to the lives of those inside the

9    Tahoe or the other vehicles traveling on the interstate.

10    Agent Aoude parked his vehicle on the emergency turnaround and began running after the Tahoe

11    on foot.  Agent Aoude maintained visual contact with the Tahoe for a tenth of a mile and observed the

12    vehicle stop in the middle of the #2 lane on Interstate 8. As Agent Aoude approached the vehicle, he

13    observed the driver's side door open.  Agent Aoude immediately shined his flashlight on the driver side

14    door, observing one occupant, wearing a black jacket, blue jeans, and white shoes, depart from the

15    vehicle and began running southbound up a hill to avoid being apprehended.   Agent Aoude also

16    observed three other occupants -- two that exited from the passenger side door, and one that exited from

17    the driver side rear door -- follow the driver up the hill. Other agents arrived on scene and secured the

18    Tahoe. The agents identified themselves as Border Patrol agents and questioned the occupants of the

19    vehicle as to their citizenship. All subjects stated that they were citizens and nationals of Mexico and

20    did not have any legal immigration documents that would allow them to be in the United States legally.

21    As Agent Clay Liedecke was removing the people from the Tahoe, he observed three black trash bags

22    behind the driver's seat. The smell emanating from the bags was that of marijuana. (It was later

23    determined the bags held 32.7 pounds of marijuana.) Agent Liedecke also located a Kenwood two-way

24    radio in the center console between the driver's seat and passenger's seat.  All seven subjects were

25    arrested and taken to the Boulevard Station along with the three black bags for processing.

26

27

28

Field Operations Supervisor (FOS) C. Allen arrived at the scene where the vehicles came to a stop.  Agents began following the foot signs of the four subjects who ran from the silver Tahoe.  These were the only foot signs in the area. Initially all four subjects stayed together while running from the pursuing agents. After a short distance, however, one of the subjects broke away from the others and headed in a completely opposite direction. While following the foot signs, a fresh bloody hand print was found on a fence post. Agent Petras found another Kenwood two-way radio on the ground at that same fence post. Agents continued to follow the signs southbound. Agents believed that one of the subjects had suffered lacerations on his or hand based on the blood on the post.  A short time later, FOS Allen was notified by Agent J. Fistola that he had located footprints that matched the description FOS Allen had described on the radio and was following the footprints.

Approximately thirty minutes later, FOS Allen was notified by Agent Fistola that the footprints had led him to a subject that was trying to conceal himself under some bushes north of Interstate 8. Agent Fistola apprehended the subject. At approximately 11:00 p.m., Agent J. Petras arrived on scene to assist Agent Fistola. Agent Fistola identified himself as a Border Patrol Agent and questioned the subject later identified as defendant Benavides as to his citizenship in the Spanish language. Benavides stated that he was from Tijuana, Mexico. Notably, Benavides had a laceration on his hand, which agents believed was caused by jumping over a barbed wire fence. Benavides also had scratches on his face consistent with running through the thick brush at night and in the dark. Benavides was arrested and transported to the Boulevard Station for processing.  At the station, Agent Aoude positively identified Benavides as the individual he had observed running away from the silver Tahoe.

**C.** **Statements**

Four material witnesses retained in this case.  Each of the material witnesses – Esther Gonzalez-Diaz, Omar Abraham Rojas-Rojas, Gabriel Hernandez-Cortez, and Victorino Diaz-Reyes – stated that they are citizens and nationals of Mexico and illegally present in the United States.  They stated they had made arrangements to be smuggled into the United States and were to pay between $2,500 and $2,600 to smuggled.  Each material witness was presented with a photo array of 13 photographs and each identified defendant Fernandez as one of their foot guides, and stated that defendant Benavides was not one of the undocumented aliens in their group.  Both defendants were Mirandized and both invoked.

1

## III

2

## **DEFENDANT'S DISCOVERY MOTION**

3      The initial 297 pages of discovery provided in this case included reports of the Defendant's

4 arrest, and prior apprehensions, as well as his rap sheet, and photographs from the date of arrest.  Each

5 defendant was also provided with DVDs of each a material witnesses' statements as well as their own.

6 Additional discovery requests are discussed below.

7 **(A)**      **Defendant's Statements**

8      The Government recognizes its obligation, under Rules 16(a)(1)(A) and 16(a)(1)(B), to provide

9 to Defendant the substance of Defendant's oral statements and Defendant's written statements.  (Unless

10 otherwise noted, all references to "Rules" refers to the Federal Rules of Criminal Procedure.)  The

11 Government has produced all of the Defendant's statements that are known to the undersigned Assistant

12 U.S. Attorney at this date.  If the Government discovers additional oral or written statements that require

13 disclosure under Rule 16(a)(1)(A) or Rule 16(a)(1)(B), such statements will be promptly provided.

14      The Government has provided Defendant with all known reports related to Defendant's arrest

15 in this case.  Furthermore, the Government will continue to comply with its obligation to provide to

16 Defendant all reports subject to Rule 16.  The Government has no objection to the preservation of the

17 agents' handwritten notes.  See United States v. Harris, 543 F.2d 1247, 1253 (9th Cir. 1976) (agents must

18 preserve their original notes of interviews of an accused or prospective government witnesses).

19 However, the Government objects to providing Defendant with a copy of the rough notes at this time.

20 The Government is not required to produce the notes pursuant to the Jencks Act because the notes do

21 not constitute "statements" (as defined 18 U.S.C. § 3500(e)) unless the notes (1) comprise both a

22 substantially verbatim narrative of a witness' assertion, and (2) have been approved or adopted by the

23 witness.  United States v. Spencer, 618 F.2d 605, 606-07 (9th Cir. 1980).  The notes are not Brady

24 material because, as discussed further, the notes do not present any material exculpatory information

25 or any evidence favorable to Defendant that is material to guilt or punishment.  If, during a future

26 evidentiary hearing, certain rough notes become particularly relevant, the notes in question will be made

27 available to Defendant.

28

**(B)     Defendant's Prior Record**

1

2          The Government has provided Defendant with a copy of his known prior criminal record as well

3   as prior apprehension report and, consequently, has fulfilled its duty of discovery under Rule

4   16(a)(1)(D).  See United States v. Audelo-Sanchez, 923 F.2d 129 (9th Cir. 1990).  To the extent that the

5   Government determines that there are any additional documents reflecting Defendant's prior criminal

6   record, the Government will provide those to Defendant.  The Government will disclose in advance of

7   trial the general nature of any "other bad acts" evidence that the United States intends to introduce at

8   trial pursuant to Fed. R. Evid. 404(b).   Evidence should not be treated as "other bad acts" evidence

9   under Fed. R. Evid. 404(b) when the evidence concerning the other bad acts and the evidence

10  concerning the crime charged are "inextricably intertwined."  United States v. Soliman, 812 F.2d 277,

11  279 (9th Cir. 1987).

**(C)     Tangible Items**

12

13         The Government has complied and will continue to comply with Rule 16(a)(1)(E) in allowing

14  Defendant an opportunity, upon reasonable notice, to examine, inspect, and copy all evidence seized that

15  is within its possession, custody, or control, and that is either material to the preparation of Defendant's

16  defense, or is intended for use by the Government as evidence during its case-in-chief at trial, or was

17  obtained from or belongs to Defendant.  The Government need not, however, produce rebuttal evidence

18  in advance of trial.  United States v. Givens, 767 F.2d 574, 584 (9th Cir. 1984).

**(D)     Brady Material**

19

20         The Government has and will continue to perform its duty under Brady v. Maryland, 373 U.S.

21  83 (1963) to disclose material exculpatory information or evidence favorable to Defendant when such

22  evidence is material to guilt or punishment.  The Government recognizes that its obligation under Brady

23  covers not only exculpatory evidence, but also evidence that could be used to impeach witnesses who

24  testify on behalf of the United States.  See Giglio v. United States, 405 U.S. 150, 154 (1972); United

25  States v. Bagley, 473 U.S. 667, 676-77 (1985).  This obligation also extends to evidence that was not

26  requested by the defense.  Bagley, 473 U.S. at 682; United States v. Agurs, 427 U.S. 97, 107-10 (1976).

27  "Evidence is material, and must be disclosed (pursuant to Brady), 'if there is a reasonable probability

28  that, had the evidence been disclosed to the defense, the result of the proceeding would have been

different.'" <u>Carriger v. Stewart</u>, 132 F.3d 463, 479 (9th Cir. 1997) (<u>en banc</u>).  The final determination of materiality is based on the "suppressed evidence considered collectively, not item by item." <u>Kyles v. Whitley</u>, 514 U.S. 419, 436-37 (1995).  <u>Brady</u> does not, however, mandate that the Government open all of its files for discovery.  <u>See United States v. Henke</u>, 222 F.3d 633, 642-44 (9th Cir. 2000) (per curiam).  Under <u>Brady</u>, the United States is not required to provide: (1) neutral, irrelevant, speculative, or inculpatory evidence (<u>see United States v. Smith</u>, 282 F.3d 758, 770 (9th Cir. 2002)); (2) evidence available to the defendant from other sources (<u>see United States v. Bracy</u>, 67 F.3d 1421, 1428-29 (9th Cir. 1995)); (3) evidence that the defendant already possesses (<u>see United States v. Mikaelian</u>, 168 F.3d 380-389-90 (9th Cir. 1999) <u>amended by</u> 180 F.3d 1091 (9th Cir. 1999)); or (4) evidence that the undersigned Assistant U.S. Attorney could not reasonably be imputed to have knowledge or control over.  <u>See United States v. Hanson</u>, 262 F.3d 1217, 1234-35 (11th Cir. 2001).   <u>Brady</u> does not require the Government "to create exculpatory evidence that does not exist," <u>United States v. Sukumolahan</u>, 610 F.2d 685, 687 (9th Cir. 1980), but only requires that it "supply a defendant with exculpatory information of which it is aware." <u>United States v. Flores</u>, 540 F.2d 432, 438 (9th Cir. 1976).

In addition, the Government recognizes its obligation under <u>Brady</u> and <u>Giglio</u> to provide evidence that could be used to impeach Government witnesses, including material information regarding demonstrable bias or motive to lie.  However, Defendant is not entitled to any evidence that a prospective witness is under criminal investigation by federal, state, or local authorities.  The Government is also under no obligation to turn over the criminal records or rap sheet of its potential witnesses.  <u>United States v. Taylor</u>, 542 F.2d 1023, 1026 (8th Cir. 1976).  The Government will, however, provide the conviction record, if any, which could be used to impeach witnesses the Government intends to call in its case-in-chief.  The Government also recognizes that the obligation under <u>Brady</u> and <u>Giglio</u> to provide material evidence that could be used to impeach Government witnesses includes material information related to perception, recollection, ability to communicate, or truth telling.  However, the Government strenuously objects to providing any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an alcoholic because such information  is not discoverable under Rule 16, <u>Brady</u>, <u>Giglio</u>, <u>Henthorn</u>, or any other Constitutional or statutory disclosure provision.

1        With respect to witness addresses, the Government has already provided Defendant with the

2   reports containing the names, work addresses, and telephone numbers of the inspectors, officers and

3   special agents whom asked questions of Defendant.  In its trial memorandum, the Government will

4   provide Defendant with a list of all witnesses whom it intends to call in its case-in-chief, although

5   delivery of such a witness list is not required.  <u>See</u> <u>United States v. Discher</u>, 960 F.2d 870 (9th Cir.

6   1992); <u>United States v. Mills</u>, 810 F.2d 907, 910 (9th Cir. 1987).  The Government strenuously objects

7   to providing the home addresses or the home or personal cell phone numbers to Defendant.  In

8   non-capital cases, the Government is not even required to disclose the names of its witnesses prior to

9   trial.  <u>United States v. Dishner</u>, 974 F.2d 1502, 1522 (9th Cir 1992); (<u>citing</u> <u>United States v. Steel</u>, 759

10  F.2d 706, 709 (9th Cir. 1985)); <u>United States v. Hicks</u>, 103 F.23d 837, 841 (9th Cir. 1996); <u>see</u> <u>also</u>

11  <u>United States v. Bejasa</u>, 904 F.2d 137 (2d Cir. 1990) (holding that United States did not improperly deny

12  defendant access to government witnesses whose telephone numbers and addresses the government

13  refused to provide because defendant knew the identities of the government witnesses and presumably

14  knew their telephone numbers or could have contacted them through the exercise of due diligence).

15       The Government understand that an agreement that the Government makes with a witness for

16  testimony in exchange for money or in exchange for favorable treatment in the criminal justice system

17  is generally subject to disclosure as impeachment evidence under <u>Brady</u> and <u>Giglio</u>.  <u>See</u> <u>United States</u>

18  <u>v. Kojayan</u>, 8 F.3d 1315, 1322-23 (9th Cir. 1993); <u>Benn v. Lambert</u>, 238 F.3d 1040, 1054-60 (9th Cir.

19  2002).  However, the Government is not aware of any <u>Giglio</u> information related to this case.  If the

20  Government discovers the existence of <u>Giglio</u> information, the information will be provided to the

21  Defendant.  At this time, the Government is not aware of any confidential informants or cooperating

22  witnesses involved in this case.  The Government must generally disclose the identity of informants

23  where (1) the informant is a material witness, or (2) the informant's testimony is crucial to the defense.

24  <u>Roviaro v. United States</u>, 353 U.S. 53, 59 (1957).  If there is a confidential informant involved in this

25  case, the Court may, in some circumstances, be required to conduct an in-chambers inspection to

26  determine whether disclosure of the informant's identity is required under <u>Roviaro</u>.  <u>See</u> <u>United States</u>

27  <u>v. Ramirez-Rangel</u>, 103 F.3d 1501, 1508 (9th Cir. 1997).  If the Government determines there is a

28

07CR3404-JLS

1   confidential informant somehow involved in this case, it will either disclose the identity of the informant

2   or submit the informant's identity to the Court for an in-chambers inspection.

3       Rule 26.2 incorporates the Jencks Act, 18 U.S.C. §3500, into the Federal Rules of Criminal

4   Procedure. The Jencks Act requires that, after a Government witness has testified on direct examination,

5   the Government must give the Defendant any "statement" (as defined by the Jencks Act) in the

6   Government's possession that was made by the witness relating to the subject matter to which the

7   witness testified. 18 U.S.C. §3500(b). For purposes of the Jencks Act, a "statement" is (1) a written

8   statement made by the witness and signed or otherwise adopted or approved by her, (2) a substantially

9   verbatim, contemporaneously recorded transcription of the witness's oral statement, or (3) a statement

10  by the witness before a grand jury. 18 U.S.C. §3500(e). If notes are read back to a witness to see whether

11  or not the government agent correctly understood what the witness was saying, that act constitutes

12  "adoption by the witness" for purposes of the Jencks Act. United States v. Boshell, 952 F.2d 1101, 1105

13  (9th Cir. 1991) (citing Goldberg v. United States, 425 U.S. 94, 98 (1976)). Jencks will be complied with

14  at the time of trial.

15  **(E)    Expert Summaries**

16      Defendant requests the results of any scientific or other tests or examinations in connection with

17  this case. The Government will disclose to Defendant the name, qualifications, and a written summary

18  of testimony of any expert the Government intends to use during its case-in-chief at trial pursuant to

19  Fed. R. Evid. 702, 703, or 705.

20                                              **III**

21          **DEFENDANT'S MOTION FOR LEAVE TO FILE FURTHER MOTIONS**

22      The Government does not oppose Defendant's request for leave to file further motions, as long

23  as such motions are based on discovery not yet received by Defendant.

24      DATED: January 15, 2008

25                                  Respectfully Submitted,

26                                  KAREN P. HEWITT
                                    United States Attorney

27                                  /s/ ***Rebekah W. Young***

28                                  REBEKAH W. YOUNG
                                    Assistant U.S. Attorney

                                    11                              07CR3404-JLS

1
2
3

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

4
5
6
7
8
9
10
11

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal Case No. 07CR3404-JLS |
| Plaintiff, | |
| v. | |
| JESSE BENAVIDES. Jr, and<br>JOSE FERNANDEZ-FERNANDEZ a.k.a.<br>JOSE BECERRA-CASILLAS, | CERTIFICATE OF SERVICE |
| Defendant. | |

12  IT IS HEREBY CERTIFIED THAT:

13      I, REBEKAH W. YOUNG, am a citizen of the United States and am at least eighteen years of age.  My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

14
15      I am not a party to the above-entitled action.  I have caused service of **GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR DISCOVERY** on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF
16  System, which electronically notifies them.

17      Michael Messina
    Rosayln Feral
18      Jonathan Frank

19      I hereby certify that I have caused to be mailed the foregoing, by the United States Postal Service, to the following non-ECF participants on this case:

20
21      None

22  the last known address, at which place there is delivery service of mail from the United States Postal Service.

23      I declare under penalty of perjury that the foregoing is true and correct.

24      Executed on January 15, 2008.

25                                      /s/ ***Rebekah W. Young***
                                      REBEKAH W. YOUNG
26                                      Assistant U.S. Attorney

27
28